OPINION OF THE COURT
Walter J. Reliman, Jr., J.
Mu Chapter of the Sigma Pi Fraternity of the United States, Inc. (Mu), hired Northeast Construction Services, Inc. (NE), to perform extensive renovations and improvements upon an existing fraternity structure, including the construction of a new four-story addition. The lump-sum price of the job was $664,200, the largest part of which (perhaps $400,000-500,000) was allocable to the new addition. On the morning of April 28, 1994, the NE crew began work, using acetylene torches to remove certain iron work. At noon, the crew took a lunch break. Returning a few minutes later, they found the building in flames. It was a total loss.
Separate police and fire department investigations concluded the fire probably had been accidentally started by an improper use of the torches by NE employees. However, NE stoutly denies any such negligence. A question of fact appears to exist. Mu was paid $670,000 for the loss by its insurer, CNA, which, as subrogee, now sues NE to recover that sum. NE moves to dismiss the CNA complaint in action No. 2 based on the Mu waiver of claims and waiver of subrogation found in the construction contract between Mu and NE.
NE also moves to dismiss the separate and distinct Mu complaint in action No. 1 which seeks to recover $1,431,250 based upon the cost of replacement, fixed by a new contract between Mu and a successor contractor, plus consequential damages. It is not clear how much of the new contractual sum is attributed to replacing the existing structure and how much to the construction of a new four-story addition. At the time of the fire, work on the addition had not begun and, hence, no loss to the nonexistent addition could have occurred. No claim was made by Mu for any loss attributed to the future addition and, needless to say, no such payment was made by CNA. Moreover, the Mu claim makes no deduction from its claim against NE for the CNA proceeds already in its hands. The customary measure of damages, unless modified by contract, is the difference between the fair market value of the property before and after the fire or the replacement cost, whichever is less. Mu’s own estimator placed the diminution of value at $760,000. The *376 cost of replacement of the existing structure, for the reasons stated earlier, is not entirely clear.
Mu and NE, as part of their contract, agreed to an insuring plan designed to minimize project costs by eliminating redundant and expensive policies of insurance. The plan was also designed to prevent disputes and litigation between the parties and the multiplicity of insurers often involved in such projects. The centerpiece of the insuring plan is found at paragraph 11.3.1 of the General Conditions of the Mu-NE contract which required Mu to buy property insurance in the amount of the initial “contract sum” (i.e., $664,200), plus any increase in such costs brought about by change orders. The owner is obliged to maintain such insurance until completion. The property insurance specified in the contract would insure against fire and provide extended coverage for physical loss or damage including theft, vandalism, architect services and other consequential items (para 11.3.1.1).
Most importantly, paragraph 11.3.1 provides that “This insurance shall include interests of the Owner, the Contractor, Subcontractors and Sub-subcontractors in the Work.” Paragraph 11.3.7 adds: “The Owner and the Contractor waive all rights against (1) each other * * * for damages caused by fire or other perils to the extent covered by property insurance obtained pursuant to this paragraph 11.3 or other property insurance applicable to the work * * * A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification * * * and whether or not the person or entity had an insurable interest in the property damages.” The waiver includes any claim for loss of use of the owner’s property “including consequential losses due to fire” (para 11.3.3).
There is an option: If the owner declines to purchase such insurance, it may inform the contractor in writing prior to commencement of the work. In that event, the contractor may then effect insurance which will protect the interests of the contractor, subcontractors and sub-subcontractors and, by change order, bill such insurance costs to the owner. If the contractor is damaged by the owner’s failure to give notice that it has elected not to provide the insurances described by the contract, “then the owner shall bear all reasonable costs properly attributable thereto” (para 11.3.1.2). No such notice was given by Mu to NE and, consequently, Mu was bound by the contract to provide the stipulated insurance or the benefits which such compliance would have afforded the other parties.
*377 The “wrap-up” insurance concept is far from new and does not offend New York law or public policy (Board of Educ. v Valden Assocs., 46 NY2d 653; Viacom Intl. v Midtown Realty Co., 193 AD2d 45, 53; Interested Underwriters at Lloyd’s v Ducor’s, Inc., 103 AD2d 76, 77, affd 65 NY2d 647). Such plans are especially useful in the construction industry where multiparty projects abound, most involving potentially dangerous operations attended by high risks of property damage due to fire and other accidents. Inevitably, the marketplace imposes the costs of such risks upon the owner as the ultimate beneficiary of the work. The owner, as money manager of the project, is in a unique position to coordinate the project, including its insurance program. It behooves the owner to require an insuring plan which provides maximum protection, at minimum costs, while reducing or eliminating delays, disputes and eventual litigation (cf., Relihan, Insuring Public Construction: A New Departure for the Empire State, 36 Ins Couns J 76 [Jan. 1969]).
The A201 form of the American Institute of Architects (AIA) General Conditions used in this project is an example of just such a plan. These provisions, adopted in 1987, removed the problem posed by S.S.D.W. Co. v Brisk Waterproofing Co. (76 NY2d 228), which held that the form of contract used by the parties required the owner to protect only the builder’s insurable interest which, the Court held, was limited to the contractor’s tools and such materials as the contractor added to the owner’s property. As the Brisk dissenter pointed out (Alexander, J., dissenting), omitting the owner’s property interest from the insuring plan defeats the whole purpose of the “wrap-up” concept. Accordingly, the revised version of the AIA General Conditions (A201 form) modified the insurance provisions to make it clear that the owner, for the mutual benefit of all, would insure the entire bundle of property interests, regardless of any technical notions regarding the multiplicity of insurable interests which might be involved.
Mu seeks to escape the terms of the insuring plan on several grounds: Since the fire consumed the building on the first day of work, Mu contends, the “Work” had not yet come into being and, therefore, could not be covered by the insuring plan. Since the insuring plan requires NE to carry insurance to cover damage to tangible property “other than to the Work itself’, Mu argues, NE was obliged to insure itself against any claim by the owner for damage to the building which preexisted the commencement of the “Work”.
*378 This convoluted argument, based on the Brisk rationale, is no longer tenable under the new AIA form. The “Work” had begun when the NE crew arrived at the site on April 28, 1994 and began to remove iron fire escapes and other metal structures with acetylene torches, pursuant to the contract. Section 1.1.3 defines the “Work” as the construction and services required by the contract “whether completed or partially completed * * * The work may constitute the whole or a part of the Project”. Nothing could be more comprehensive. Clearly the “Work” was not completed but, having begun, it was necessarily “partially completed” no matter how limited the degree of completion when the fire occurred.
The property insurance carrier for Mu, assuming the fraternity had carried out its obligations under paragraph 11.3.1, would be responsible for the payment of any loss involving any part of the “Work”. Any such loss would be paid “on a replacement cost basis” (para 11.3.1) and would cover the extended risks defined at paragraph 11.3.1.1. As it happened, Mu did not procure the insurance stipulated in the contract. Instead, the fraternity relied upon an existing property policy with a limit of $670,000 plus an additional $200,000 installation floater for the first portion of the construction contract. Thus, Mu argues, it had insurance in place which satisfied its duty to NE under the terms of the insuring plan. We disagree. In the absence of advance notice to NE, giving the contractor the opportunity to obtain its own builder’s risk policy at the owner’s expense and with the coverages stipulated in the contract, Mu’s actions were not in compliance with the contract. If the contractor is damaged by the failure or neglect of the owner to purchase or maintain the insurance coverages required by the contract, the owner must bear “all reasonable costs properly attributable thereto” (para 11.3.1.2).
Mu also claims that its duty to insure the “Work” was removed by a modification of the contract in the form of a letter agreement of April 15, 1994 which deleted the requirement that the owner procure “Builder’s Risk” insurance. Again, we disagree. The letter was sent by NE to Mu as part of the contractor’s revised and reduced estimate of the cost of the “Work”. The new estimate listed 36 changes or clarifications and deducted from the project costs about two dozen items including (No. 18) “Builder’s Risk or Owner’s Protective Insurance” which, in the absence of the insuring plan, NE would have included in the bill to be submitted to the owner. As we have seen, the insurance plan required the owner to provide *379 property damage insurance, not the contractor. The letter is entirely consistent with the insurance plan and changes none of its terms.
NE did not agree to insure the building against fire and paragraph 11.1.1.5 is not such an undertaking. Article Eleven begins with paragraph 11.1 entitled “Contractor’s Liability Insurance”. Five subdivisions follow, including: workers’ compensation and bodily injury coverage for the contractor’s own work force; bodily injury claims by persons other than employees; claims for monetary damage, other than to the work itself vehicular insurance; and other claims against NE. The next section, 11.2, is entitled “Owners [sic] Liability Insurance” with similar provisions. Paragraph 11.3, entitled “Property Insurance”, deals with a distinct topic. It assigns the risk of loss and the duty of insuring the building against fire to the owner. Obviously, it is not intended that a subdivision of the “Contractor’s Liability Insurance” section of the contract should contradict the provisions of the “Property Insurance” section on the same page and, thus, nullify the entire purpose of the insuring arrangement.
To summarize: the Mu claim in action No. 1 involves, in part, an addition not yet begun and, consequently, not yet damaged or destroyed. There is no cause of action for a metaphysical property loss of this character. The remainder of the Mu claim, so far as we can determine, involves losses which the owner should have insured against under paragraphs 11.3.1 and 11.3.1.1. The waiver of claims provisions of the contract prevents Mu from shifting such losses to NE. Moreover, under paragraph 11.3.3, Mu has waived any claim for “loss of use of the Owners [sic] property, including consequential losses due to fire or other hazards however caused”. At the very least, this proviso covers any consequential damages associated with loss of use, whether or not such a risk should have been insured against under paragraphs 11.3.1 and 11.3.1.1. CNA, as subrogee of Mu, is not entitled to sue NE unless losses were incurred which are beyond those which Mu promised to insure for the benefit of all.
Hence, unless advised by counsel to the contrary, it appears that all claims by Mu and CNA against NE are barred not only because the loss should have been insured by the owner for the benefit of all but also because the owner has waived all claims for the losses described in the General Conditions. We suggest that counsel confer together and advise the court whether any residual loss has been sustained by Mu which escapes these *380 impediments. If so, the Mu motion for partial summary judgment on the issue of liability must be considered. For reasons stated earlier, a question of fact exists regarding the cause of the fire and, consequently, the motion must be denied. If no losses can be shown to remain, the NE motions to dismiss the Mu and CNA complaints must be granted in their entirety.